**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON**

KATRINA HARVIN,                           )        CASE NO. 1:21-CV-01555-CEH
                                          )
              Plaintiff,                  )
                                          )
                                          )        MAGISTRATE JUDGE
       v.                                 )        CARMEN E. HENDERSON
                                          )
COMMISSIONER OF SOCIAL SECURITY           )        MEMORANDUM OPINION AND
ADMINISTRATION,                           )        ORDER
                                          )
              Defendant,                  )

## I.      Introduction

Plaintiff, Katrina Harvin, seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 8). Because the ALJ followed proper procedures and his findings are supported by substantial evidence, the Court AFFIRMS the Commissioner's final decision denying Harvin SSI and DIB.

## II.     Procedural History

On November 17, 2016, Harvin filed an application for SSI, alleging a disability onset date of May 1, 2012. (ECF No. 10, PageID #: 254). Harvin eventually amended her onset date to October 19, 2016. (ECF No. 10, PageID #: 1198). The application was denied initially and upon reconsideration. (ECF No. 10, PageID #: 180, 195). After a hearing, the ALJ determined that Harvin was not disabled on October 25, 2018. (ECF No. 10, PageID #: 49). The ALJ's decision became final on September 11, 2019, when the Appeals Council declined further review. (ECF

1

No. 10, PageID #: 40). Harvin filed a Complaint in this Court, challenging the ALJ's decision. On the parties' stipulation, the Court remanded the case to the ALJ and Commissioner. (ECF No. 10, PageID #: 311).

While Harvin's claim was pending, she filed a subsequent application for DIB. On remand, the ALJ consolidated Harvin's applications. (ECF No. 10, PageID #: 1199). On September 13, 2020, the same ALJ held a hearing, during which Harvin—represented by counsel—a medical expert, and an impartial vocational expert testified. (ECF No. 10, PageID #: 1228). On November 17, 2020, the ALJ issued a written decision finding Harvin was not disabled. (ECF No. 10, PageID #: 1195). The ALJ's decision became final on July 14, 2021, when the Appeals Council declined further review. (ECF No. 10, PageID #: 1188).

On August 10, 2021, Harvin filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 13, 14). Harvin asserts the following assignments of error:

> (1) The ALJ's finding that Ms. Harvin is limited to sitting six hours a day precludes the performance of the jobs identified by the vocational expert
>
> (2) The ALJ violated the treating physician rule by cherry picking the evidence and excluding opinions regarding disabling limitations
>
> (3) The ALJ's assessment of Residual Functional Capacity is not supported by the weight of substantial evidence

(ECF No. 13 at 1).

## III.    Background

### A.    Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Harvin's hearing:

> The claimant alleges that she has been unable to sustain full time

2

work activity during the relevant period due to a combination of symptoms from her impairments including depression; sleep apnea; arthritis in bilateral knees; back problems; bipolar disorder; and mental state (C1E:2; C13E:2; hearing testimony). The claimant testified that she has used a cane for approximately 4-5 years (hearing testimony). The claimant reported that she is able to perform personal care activities such as using the bathroom and washing her face, but also reported that getting dressed takes longer because she experiences shortness of breath (hearing testimony). She also testified that she uses her cane to walk and that she cannot walk without using the cane (hearing testimony). The claimant reported that she spends time watching television and sometimes leaves the house, but she is not able to drive herself and her husband drives her places (hearing testimony). She also stated that she does not cook and her husband performs the cooking in their home (hearing testimony). The claimant testified that she is able to go grocery shopping, but she uses a motorized scooter while shopping, and her husband helps her unload the groceries when she returns home (hearing testimony). She testified that it "has been years" since she last drank alcohol and reported that she occasionally does laundry but otherwise she does not do the household chores (C3E; hearing testimony). She testified that she experiences pain and described it on the date of the hearing as a 7/10 on the pain scale (hearing testimony). She also reported that she takes medications including Tylenol and ibuprofen for the pain, and reported the medications work to improve her symptoms taking the pain away completely for a couple of hours (hearing testimony). She testified that she can only stand for approximately one minute before needing to sit down because of pain and discomfort in her legs and lower back, and reported she can only sit for about three minutes before needing to get up and move around due to pain in her back (hearing testimony). She reported that she spends most of her day sitting on her bed with her legs propped up, and testified that she has difficulty lifting due to her lower back and knees (hearing testimony). The claimant testified that she also experiences symptoms from depression including crying spells, and from anxiety explaining that she gets easily aggravated (C3E; hearing testimony).

(ECF No. 10, PageID #: 1207).

**B.        Relevant Medical Evidence**

The ALJ also summarized Harvin's health records and symptoms:

The claimant has a documented history of severe physical

3

impairments including morbid obesity, degenerative joint disease in both knees; degenerative disc disease in the lumbar spine; chronic obstructive pulmonary disease; asthma; and obstructive sleep apnea. The claimant has not had, and has not needed to have, any surgery since October 19, 2016 aside from the hysterectomy she had on November 11, 2016. Prior to the November 11, 2016 surgery, on October 28, 2016, the claimant was described as being a NYHA class I heart patient (C5F:5), which according to the New York Heart Association classification system, is someone "without limitations of physical activity,- that is -ordinary physical activity does not cause undue fatigue, palpitation, or dyspnea. (C5F:5). . . .

The claimant also described herself on October 28, 2016, . . . as not having any back pain, or any joint pain, or any muscle pain (C5F:5). The claimant's medical records since October 19, 2016 include few, if any, complaints about problems sitting, walking, or standing. The claimant has been described on numerous occasions since October 19, 2016 as having normal physical examinations. Again, and more specifically, such normal findings have included, but are not limited to, references to the claimant being neurologically intact, and having a normal gait and normal muscle strength (C5F:6; C11F:20, 29, 47, 53; C15F:12, 21, 34, 48). The medical records also indicate physical exam findings including unlabored breathing; not being in any physical distress; and not needing to use assistive devices for extended periods (C5F:6; C10F:303, 316; C11F:20, 29, 47, 52-53, 65; C14F:5; C15F:11, 21, 34, 53). The claimant reported on December 7, 2016 that she could walk one mile before needing to stop and rest and she also reported in June 2018 that she could walk one mile (C3E:1; hearing testimony).

On July 3, 2017, the claimant described herself as not having any problems walking and as not having any muscle weakness (C11F:20). In August 2017, the claimant's diagnosed condition of COPD was described as being "stable" with prescribed medication (C11F:65). Treatment records also noted bilateral knee edema and knee crepitus, but notes also indicate she was prescribed NSAIDs, was not a surgical candidate, and she refused steroid injections in August 2017 (C11F:65). At a follow up in June 2018, the claimant reported ongoing bilateral knee pain and requested a shower chair as well as new knee brace (C17F:1). At that time she also reported bilateral hip pain and physical exams noted some tenderness over the bilateral hips, but x-rays showed only mild hip osteoarthritis of the left, and mild over coverage of the femoral head by the acetabular roof which may be associated with pincer type femoroacetabular impingement (C17F:1-9).

4

The claimant continued to report bilateral knee pain in addition to morbid obesity, major depressive disorder, obstructive sleep apnea, and primary osteoarthritis of both knees, and established care with a new provider, Saad Munzar, in August 2018 (C24F). . . . On December 4, 2018, the claimant reported increased leg pain after having moved residences, and she also reported that she had been to two job interviews but felt she may not have been considered because they saw her walking with a cane (C24F:50). At a follow up in February 2019, . . . [p]hysical exam findings noted she was in no acute distress, was conversant, language was intact, and she was attentive and oriented, and her extremities were warm and well perfused without cyanosis (C24F:58). . . .

The claimant continued to report ongoing knee pain as well, and followed up in December 2019 with Kim Stearns, M.D. (C24F:6). She reported having knee problems for 30 years, explaining she experienced aching pain in the left knee, and with pain at rest and with all physical activities (C24F:6). She appeared ambulating with a cane, and described pain going up and down stairs, and getting up from a seated position, and reported that she took over the counter medication but had no other treatment (C24F:6). Physical examination findings noted the left knee had trace effusion with mild varus crepitation and limited painful range of motion from 0-110 degrees; antalgic gait; no instability but a lot of guarding; and x-rays showed marked arthritis in the knee (C24F:6). The left knee was injected with Marcaine 2 cc and 80 mg of Depo-Medrol and Mobic was prescribed (C24F:6).

Records also indicate the claimant reported left foot pain in January 2020 after she slipped and fell down on stair rolling her left ankle (C25F; C26F:3). Imaging confirmed a nondisplaced left fibular tip fracture of the lateral malleolus (C26F:3-7). Physical examination from January 29, 2020 noted tenderness upon palpation to the left medial ankle with no gross deformity, ecchymosis identified, and a minimal amount of non-pitting edema of the left ankle; but DP PT pulses were strong, her spine appeared normal, range of motion was not limited, and she had no focal, motor, or sensory deficits (C26F:4-5). She was given a walking boot in the emergency room and a prescription for Naprosyn and Percocet and urged to follow up with orthopedics within the next week, and was discharged in stable condition (C26F:5). At a follow up on February 4, 2020, an x-ray showed no interval change in appearance of the lateral malleolus and small calcification is likely from ligament avulsion (C27F:7). Additionally, a venous duplex ultrasound examination was performed on February 4,

2020, revealing spontaneous and respirophasic flow in the common femoral vein on the right side; and the left side was negative for acute deep vein thrombosis; normal color and pulsed Doppler signals were noted, however, unable to compress the femoral vein at distal due to body habitus and patient intolerance (C27F:11). Physical examination findings noted tenderness to palpation of the left calf, ankle and midfoot/forefoot; antalgic gait favoring the left ankle and foot; and significant soft tissue swelling of the left dorsal foot and lower leg (C27F:14). Exam findings also noted that she had full range of motion in the bilateral lower extremities; 5/5 bilateral lower extremity strength; was alert and oriented; 2+ DP pulses; was in no respiratory distress and no labored breathing; appeared healthy and pleasant; and her mood and affect were appropriate (C27F:14). At a follow up on February 21, 2020, the claimant's swelling was much improved and she admitted to walking at home without the prescribed tall boot (C27F:19-20). The claimant followed up with physical therapy starting on March 9, 2020, and notes indicated she was ambulating with a cane and boot, her foot was swollen, and her range of motion was significantly reduced (C27F:22). She reported that PT was helpful for her foot, but the visits were canceled due to COVID-19, and she was taking Tylenol for pain as of April 28, 2020 (C28F:18).

Additionally, the claimant is further limited by her obesity. . . .The records in this case reflect a BMI between 40-44 (C24F:43, 57, 66, 74; C28F:5). It can be concluded that the claimant's obesity could be expected to exacerbate her knee and back pain, causing significant physical limitations which are accounted for in the residual functional capacity described herein.

The claimant also has a documented history of severe mental impairments including depressive disorder and generalized anxiety disorder. The claimant treated with pharmacological management for her depression and anxiety during the relevant period and reported compliance (C11F:71-72). She also treated with counseling and psychotherapy visits approximately once ever[y] one to three weeks during the relevant period, reporting stressors including caring for her mother, grieving the loss of her father, managing finances, housing, and frustration with family members (C18F; C19F). Mental status examination findings generally noted that she appeared well groomed, was cooperative, speech was spontaneous and normal rate, thought processes were logical and organized, there was no evidence of perceptual disturbance, and she demonstrated full range of affect, had sustained attention, concentration, and recent and remote memory were within normal

6

limits (C11F:72). Mental status examination findings also noted she had good judgment and insight, and appeared with euthymic mood at times, and cognitive function was sufficient for dialogue with the therapist (C11F:73). She did report stressors including her children, husband, financial stress, and physical health (C11F).

The claimant was described on October 28, 2016, . . . as having normal cognition (C5F:5). The claimant was described on November 22, 2016 as being coherent and not having any problems understanding or answering questions (C4E:2). The claimant has been described as having an adequate fund of knowledge (C8F:13; C10F:295; C11F:60; C15F:40). The claimant has also been described as having a good memory (C8F:13; C10F:295; Cl1F:60, 72; C15F:2, 28, 40). The claimant described herself on July 3, 2017 as not having any memory problems, and presented at a hearing on June 13, 2018 as an individual with a good memory who understood all of the questions asked of her (C11F:20; hearing testimony). . . .

(ECF No. 10, PageID #: 1207–10).

### C.    Opinion Evidence at Issue

#### 1.    State Agency Consultants

On January 31, 2017 and April 4, 2017, Abraham Mikalov, M.D. and Elizabeth Das, M.D., opined as to Harvin's RFC, respectively. (ECF No. 10, PageID #: 176, 191–92). Both doctors adopted the opinion from the prior ALJ's decision. (ECF No. 10, PageID #: 176, 191–92). They opined that Harvin would be limited to light work, with no ladders, ropes, or scaffolds. (ECF No. 10, PageID #: 176, 191–92). They stated that Harvin could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (ECF No. 10, PageID #: 176, 191–92). The ALJ considered these opinions and gave them great weight. (ECF No. 10, PageID #: 1212). He explained:

The consultants are considered to be experts in Social Security disability programs, and their opinions are consistent with the evidence, including the evidence these sources referenced in their reports, and the additional evidence I have referenced in this decision regarding the claimant's physical functioning.

7

(ECF No. 10, PageID #: 1212).

On January 7, 2020 and February 19, 2020, Linda Hall, M.D., and Indira Jasti, M.D., respectively, considered Harvin's new evidence as her first application was pending review in federal court and gave the following opinions. (ECF No. 10, PageID #: 1294, 1305). They opined that Harvin could stand or walk for a total of four hours and sit for about six hours in an eight-hour workday. (ECF No. 10, PageID #: 1294, 1305). They also suggested that Harvin could occasionally carry twenty pounds and frequently carry ten pounds. (ECF No. 10, PageID #: 1294, 1305). The doctors indicated that Harvin could also occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (ECF No. 10, PageID #: 1294–95, 1305–06).  Harvin could never climb ropes, ladders, or scaffolds. (ECF No. 10, PageID #: 1294, 1305). They also stated that Harvin should avoid concentrated exposure to extreme cold, extreme hot, humidity, fumes, odors, dusts, gases, and hazards. (ECF No. 10, PageID #: 1295, 1306). The ALJ gave these opinions great weight because they were "supported by the treatment records and [were] consistent with the overall evidence." (ECF No. 10, PageID #: 1213).

On January 31, 2017 and March 31, 2017, respectively, Judith Schwartzman, Psy.D., and Todd Finnerty, Psy.D., gave opinions on Harvin's mental impairments. (ECF No. 10, PageID #: 177–78, 192–94). They opined that Harvin had mild limitations in understanding, remembering, or applying information. (ECF No. 10, PageID #: 177, 192). Harvin had moderate limitations in the other three domains of mental functioning. (ECF No. 10, PageID #: 177–78, 192–94). They also opined that Harvin could perform simple, routine tasks without production quota requirements and that she could superficially interact with the public, coworkers, and supervisors. (ECF No. 10, PageID #: 177–78, 193). The doctors suggested a limitation allowing flexibility in the work schedule, taking breaks, and pacing for when Harvin's symptoms increase.

(ECF No. 10, PageID #: 177, 193). The ALJ stated that he "afford[ed] these opinions great weight overall." (ECF No. 10, PageID #: 1215). The ALJ explained that the opinions were "informed by program knowledge and are consistent with the overall evidence of record." (ECF No. 10, PageID #: 1215). However, the ALJ chose not to adopt the limitation requiring flexibility in work schedule, taking breaks, or pacing when Harvin's symptoms increase. (ECF No. 10, PageID #: 1215). The ALJ reasoned that that limitation was "somewhat vague and did not provide vocationally specific language as to how often her symptoms might increase, or what level of symptoms increase would lead to the need for such provisions." (ECF No. 10, PageID #: 1215–16).

### 2.  Daniel Malkamaki, M.D.

On February 26, 2018, Daniel Malkamaki, M.D., completed a medical source statement upon referral. (ECF No. 10, PageID #: 1099–100). Dr. Malkamaki opined that Harvin could occasionally lift ten pounds and frequently lift five pounds. (ECF No. 10, PageID #: 1099). He suggested that Harvin could walk one hour and sit seven hours in a workday. (ECF No. 10, PageID #: 1099). Notably, he indicated that Harvin could only stand three to five minutes without interruption. (ECF No. 10, PageID #: 1099). Dr. Malkamaki also stated that Harvin could rarely climb, balance, crouch, kneel, or crawl. (ECF No. 10, PageID #: 1100). He also suggested that Harvin needed to be able to alternate positions between sitting, standing, and walking at will. (ECF No. 10, PageID #: 1100).  Dr. Malkamaki stated that his opinion was based on Harvin's bilateral knee and lumbar spinal stenosis. (ECF No. 10, PageID #: 1099).

The ALJ considered this opinion and chose not to give it controlling weight. (ECF No. 10, PageID #: 1212). The ALJ reasoned that the opinion was not supported by or consistent with the objective evidence. (ECF No. 10, PageID #: 1213). The ALJ also stated that the opinion was

inconsistent with the state agency opinions. (ECF No. 10, PageID #: 1213).

### 3. Saad Munzar, M.D.

On February 28, 2020, Saad Munzar, M.D., completed a medical source statement regarding Harvin's physical impairments. (ECF No. 10, PageID #: 1851). Dr. Munzar indicated that Harvin could frequently carry five pounds, walk one hour of a workday, and sit one hour of a workday. (ECF No. 10, PageID #: 1851). He also opined that Harvin experienced severe pain that would interfere with her concentration, needed to elevate her legs at a forty-five-degree angle at will, and would need unscheduled breaks throughout the day. (ECF No. 10, PageID #: 1852). Dr. Munzar stated that Harvin's arthritis of the spine supported his assessment. (ECF No. 10, PageID #: 1851). The ALJ gave this opinion little weight. (ECF No. 10, PageID #: 1214). The ALJ noted that Dr. Munzar's opinion was a check-box form that was not supported by the objective medical record. (ECF No. 10, PageID #: 1214).

### 4. Treating Counselor—Rita Kanareff, LPCC-S

On January 24, 2018, Harvin's treating counselor, Rita Kanareff, LPCC-S, completed a medical source statement regarding Harvin's mental capacity. (ECF No. 10, PageID #: 1096). Ms. Kanareff indicated that Harvin had mainly mild to moderate limitations in understanding and applying information. (ECF No. 10, PageID #: 1096). She stated that Harvin had mainly moderate but some marked limitations in interacting with others, concentrating, persisting, or maintaining pace, and managing oneself. (ECF No. 10, PageID #: 1096–97). Ms. Harvin explained that her opinion was based on Harvin's emotional wellbeing after complications with her physical health. (ECF No. 10, PageID #: 1097). Ms. Kanareff indicated that Harvin's physical health stressors increased Harvin's depression and anxiety. (ECF No. 10, PageID #: 1097). The ALJ gave this opinion little weight because it was not supported by the overall

record. (ECF No. 10, PageID #: 1215). The ALJ additionally reasoned that the opinion was inconsistent with the state agency consultants' opinions. (ECF No. 10, PageID #: 1215). The ALJ chose to give more weight to the state agency consultants in part because of their expertise and because Ms. Kanereff was not considered an acceptable medical source. (ECF No. 10, PageID #: 1215).

## IV.  The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 2. The claimant has the following severe impairments: morbid obesity, degenerative joint disease of both knees, degenerative disc disease of the lumbar spine, COPD, asthma, obstructive sleep apnea, depressive disorder, and generalized anxiety disorder (20 CFR 416.920(c)).
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can lift and/or carry 20 pounds occasionally, and 10 pounds frequently; can stand and/or walk for up to 4 out of 8 hours, provided she can use a cane in her right hand; sit for 6 out of 8; push/pull is constant with the bilateral upper extremities; foot controls are occasional with bilateral lower extremities; occasionally use a ramp or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; reaching, handling, fingering, and feeling are all constant with the bilateral upper extremities; no visual or communication limitations; should avoid high concentration of extreme cold, extreme heat, humidity, or pulmonary irritants including smoke, fumes, pollutants, and dust; and must avoid entirely dangerous machinery and unprotected heights. The claimant can do no complex tasks; but can do simple (routine) tasks which I define to mean this person has the basic mental demands of competitive, remunerative, unskilled work, including the abilities to, on a sustain[ed] basis, understand, carry out, and remember simple instructions; can respond appropriately to supervision, coworkers, and usual work situations; and can deal

with changes in routine work settings; can focus attention on simple or routine work activities for at least 2 hours at a time and stay on task at a sustained rate such as initiating and perform a task that they understand and know how to do; can work at an appropriate and consistent pace, completing tasks in a timely manner; can ignore or avoid distractions while working; can change activities or work settings without being disruptive. The claimant can only do low stress work meaning no high production quotas or piece rate work; and can have occasional superficial interactions with the public and peers, meaning limited to speaking, signaling, taking instructions, asking questions, serving and no arbitration, negotiation, confrontation, supervision, or commercial driving.

(ECF No. 10. PageID #: 1202–03, 1206).

## V.     Law & Analysis

### A.          Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Harvin raises three issues on appeal. First, she asserts that the RFC precludes the performance of the jobs identified by the vocational expert. Second, she argues that the ALJ violated the treating physician rule. Third, she suggests that the ALJ's RFC is not supported by substantial evidence.

1.  **The ALJ Properly Concluded that Harvin can Perform the Jobs Identified by the Vocational Expert**

Harvin argues that she cannot perform the jobs identified by the vocational expert because she is limited to sitting a maximum of six hours a day and the vocational expert testified that the jobs he identified required the person to be seated. She states that she cannot sit a full workday and, therefore, cannot perform the jobs. Her argument is based on the following interaction between the vocational expert and Harvin's counsel:

> Q  If an individual - - okay, adding to [the ALJ's hypothetical], if an individual required an ability to alternate positions between sitting and standing at will, would there be any change in the jobs or number of jobs identified?

> A  Those jobs basically would require the person to be seated. I think that, in addition[] to the Judge's hypothetical and the restrictions indicated, would preclude competitive work without a special accommodation.

(ECF No. 10, PageID #: 1251). Harvin suggests that this interaction "clarified that '[the jobs identified] would require the person to be seated'"—meaning that limiting her to sitting a maximum of six hours a day precluded her from this work. (ECF No. 13 at 12).

However, as the Commissioner points out, Harvin fails to acknowledge that prior to this interaction, the ALJ posed a hypothetical to the vocational expert portraying an individual with Harvin's RFC—including a limitation of only sitting six hours a day—and the vocational expert testified that such a person could work as a lens inserter, document preparer, or a surveillance system monitor. (ECF No. 10, PageID #: 1249–50). In fact, the vocational expert explicitly stated that Harvin would only be precluded from those jobs if *in addition* to the hypothetical limitations posed by the ALJ, she also required an ability to alternate positions at will. The ALJ did not include such a limitation. Thus, Harvin misrepresents the vocational expert's testimony. As noted, the vocational expert specifically testified that a person with Harvin's RFC could

perform the jobs identified. This testimony provides substantial evidence to support the ALJ's conclusion that there were a significant number of jobs in the economy that Harvin could perform. *See Thompson v. Comm'r of Soc. Sec.*, No. 3:11-CV-493-H, 2012 WL 2089709, at *12 (W.D. Ky. May 7, 2012) ("The testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant." (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512–13 (6th Cir. 2010))), *report and recommendation adopted*, No. 3:11-CV-493-H, 2012 WL 2089708 (W.D. Ky. June 8, 2012)). Therefore, Harvin's first argument is without merit.

### 2. The ALJ did not Violate the Treating Source Rule

Harvin argues that the ALJ violated the treating source rule multiple times throughout his opinion.[1] The treating source rule provides that an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Harvin filed her claim before the revision took effect.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. § 404.1527(c)(2). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

Harvin argues that the ALJ violated the treating source rule by (1) "favoring" the state agency opinions and "disfavoring" the treating physician opinions. (ECF No. 13 at 15); (2) failing to identify what weight he gave Dr. Malkamaki's report and giving it less than controlling weight; (3) failing to identify Dr. Munzar as a treating physician and giving his opinion little

16

weight; and (4) assigning Counselor Kanareff's opinion little weight. The Court will take each argument in turn.

### a.        State Agency Opinions

Harvin first argues that the ALJ violated the treating source rule by failing to give his treating physicians' opinions great weight while simultaneously giving the "non-examining, non-treating" state agency physicians' opinions great weight. The Court will discuss the ALJ's treatment of each of the treating physicians' opinions below. As for the state agency opinions, the Court concludes that the ALJ did not err by assigning the state reviewing physicians' opinions greater weight than the treating source opinions. As an initial matter, the Court notes that the treating source rule does not require the ALJ to give treating physicians more weight than the state agency reviewers. *See* 20 C.F.R. § 404.1527(c) (listing factors to consider in deciding the weight to give a medical opinion). The social security regulations simply state that the ALJ will "generally" give more weight to treating source opinions. *Id.* § 404.1527(c)(2). However, when an ALJ finds that a treating source opinion is not well-supported by the medical record, the social security regulations specifically state that a relevant factor in determining the weight of an opinion is "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has." *Id*. § 404.1527(c)(6). Thus, contrary to Harvin's argument, the ALJ was entitled to rely on the state agency consultants' expertise in determining the weight to give their opinions. Moreover, assigning the state agency opinions more weight was not a per se error, so long as the ALJ gave good reasons—supported by substantial evidence—for failing to assign the treating physicians' opinions controlling weight. The ALJ did exactly that.

The ALJ considered important factors in assigning the state agency opinions great weight. Regarding Dr. Mikalov's and Dr. Das' opinions, the ALJ explained that not only were the doctors experts in social security, but also their opinions were consistent with the medical evidence. Harvin, nonetheless, takes issue with this conclusion because the opinions were issued in 2017, three years prior to the hearing and before "substantial new evidence was added to the file." (ECF No. 13 at 15). Although Harvin is correct that these opinions were issued before the inclusion of new evidence, this does not preclude the ALJ from assigning the opinion great weight. This is especially true here, where the ALJ specifically stated that the opinions were consistent with the "additional evidence" the ALJ discussed earlier in his decision. *See Ruby v. Colvin*, No. 2:13-CV-01254, 2015 WL 1000672, at *4 (S.D. Ohio Mar. 5, 2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). The Court, therefore, concludes that the ALJ did not violate the treating physician rule by giving Dr. Mikalov's and Dr. Das' opinions great weight. As Harvin did not appear to challenge the opinions of state agency physicians Dr. Hall and Dr. Jasti, the Court will not discuss the ALJ's treatment of their opinions. The Court merely notes that both opinions were given in 2020 after a review of the additional evidence and support the ALJ's RFC.

### b.     Dr. Malkamaki's Report

Harvin next argues that the ALJ violated the treating source rule by failing to identify what weight he gave Dr. Malkamaki's report and by giving it less than controlling weight. (ECF No. 13 at 15) ("[T]he ALJ errs by not identifying what weight he gives to Dr. Malkamaki's report, although he does state that he does not give it controlling weight"). In relevant part, Dr. Malkamaki opined as to the following. Harvin can occasionally lift ten pounds and frequently lift

five pounds. Harvin can walk one hour and sit seven hours in a workday. However, Harvin can only stand three to five minutes without interruption. Harvin also required the ability to alternate positions between sitting, standing, and walking at will. Dr. Malkamaki stated that his opinion was based on Harvin's bilateral knee and lumbar spinal stenosis. The ALJ considered this opinion and stated:

> I have not given controlling weight to Dr. Malkamaki's opinions for several reasons. First, I find that they are not supported by the evidence referenced above concerning the claimant's physical functioning, which establish that the claimant has the capacity to be on her feet for more than five minutes at one time. Indeed, Dr. Malkamaki's opinion on this point is at odds with the claimant's description of being able to walk for one hour without needing to take a break. Dr. Malkamaki also gave no reason why he felt the claimant could not lift more than 10 pounds except to reference the claimant's knee problems and back complaints. Dr. Malkamaki's opinions regarding the claimant's physical residual functional capacity, including his opinion that the claimant required a cane and his opinion that she would need to be allowed to change positions at will, are also at odds with the above-referenced opinions of Drs. Mikalov and Das, the abovementioned State agency physicians who reviewed this record. As between these sources, I have given more weight to Drs. Mikalov and Das' opinions. This is because Drs. Mikalov and Das are considered to be experts in Social Security disability programs, and because there is no evidence that Dr. Malkamaki's possesses such programmatic knowledge, and because their opinions are consistent with the evidence, including the evidence these sources referenced in their reports (C2A:7-8, 11; C4A:9-10), and the additional evidence I have referenced in this decision regarding the claimant's physical functioning. Notwithstanding this point, I have given the claimant the benefit of the doubt by essentially limiting her to sedentary work with an additional provision that she be able to use a cane while standing or walking.

(ECF No. 10, PageID #: 1212–13). Harvin has two issues with this analysis. First, Harvin asserts that the ALJ failed to identify the weight given to the opinion. Second, Harvin argues that the ALJ erred by failing to give the opinion controlling weight. The Court will take each argument in turn.

19

First, as to the fact that the ALJ did not assign a specific weight to the opinion, there are two issues with this argument that the Commissioner points out. The Commissioner first argues that Dr. Malkamaki was not a treating source because he gave his opinion after one appointment with Harvin. Harvin did not respond to this argument. Importantly, the regulations define a treating source as an acceptable medical source who provides the claimant with medical treatment or evaluation and who has or had "an ongoing treatment relationship" with the claimant. 20 C.F.R. § 1527(a)(2). As Dr. Malkamaki saw Harvin only once on a referral from another doctor, the Court concludes that Dr. Malkamaki was not a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship."). Thus, the ALJ could not have violated the treating source rule regarding Dr. Malkamaki's opinion.

Moreover, the Commissioner asserts that even if Dr. Malkamaki was a treating source, the failure to assign a specific weight to his opinion would be harmless. The Court agrees. A violation of the treating source rule is harmless error "where the Commissioner has met the goal of [the treating source rule] . . . even though [he] has not complied with the terms of the regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). "An ALJ may accomplish the goals of this procedural requirement by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record." *Richards v. Comm'r of Soc. Sec.*, No. 1:13 CV 1652, 2014 WL 4421571, at *9 (N.D. Ohio Sept. 8, 2014) (citations omitted). Here, as will be discussed next, the ALJ directly attacked Dr. Malkamaki's opinion and determined it did not get controlling weight. The fact that the ALJ did not state the

specific weight given is not fatal—the goal of the treating source rule was met. Thus, the Court concludes that Harvin's argument to the contrary is without merit.

Second, Harvin argues that the "ALJ's proffered reasons for rejecting Dr. Malkamaki's report are not supported by substantial evidence and do not suffice to rebut the opinion under the 'good reasons' requirement." (ECF No. 13 at 16). The Court notes that, as discussed above, Dr. Malkamaki was not a treating source and was not entitled to controlling weight. Nonetheless, the Court will consider the ALJ's analysis of the opinion because the ALJ was still required to evaluate the medical opinion. *See* 20 C.F.R. § 404.1527(c). Harvin notes that the ALJ had four reasons for rejecting Dr. Malkamaki's opinion and she takes issue with all four. The four reasons Harvin lists that the ALJ relied on were: "1) because the doctor did not possess "programmatic knowledge" of Social Security, 2) because his report was not supported by the evidence, 3) because Dr. Malkamaki's standing and walking restriction is at odds with Ms. Harvin's description of being able to walk for one hour, and 4) because Dr. Malkamaki 'gave no reason why he felt the claimant could not lift more than 10 pounds except to reference knee problems and back complaints.'" (ECF No. 13 at 17). The Court will discuss Harvin's issue with each reason.

Harvin first asserts that Dr. Malkamaki "did not require SSA's program knowledge to determine" Havin's physical limitations. However, as discussed above, a medical provider's understanding of the disability program is a factor that ALJ is entitled to consider in assigning an opinion weight. The fact that Dr. Malkamaki lacked program knowledge was a proper reason to assign his opinion less weight—especially where the opinion was at odds with the state agency reviewers who had such program knowledge. Next, Harvin argues that although the ALJ states that Dr. Malkamaki's opinion is not supported by the record, the ALJ failed to cite to any

21

medical evidence that contradicts his opinion. Although Harvin is correct that the ALJ did not cite to medical evidence when discussing Dr. Malkamaki's opinion, the ALJ specifically stated that the opinion was inconsistent with the state agency opinions and the evidence he had referenced previously in his opinion. *Hanft v. Colvin*, No. 1:15-CV-200, 2015 WL 5896058, at *10 (N.D. Ohio Oct. 8, 2015) ("The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when rejecting Dr. Garlisi's opinion does not necessitate remand of Plaintiff's case."). For example, earlier in the opinion, the ALJ explained that Harvin's treatment plans were conservative in nature and Harvin's medical records since 2016 include "few, if any, complaints about problems sitting, walking or standing." (ECF No. 10, PageID #: 1208, 1212). In explaining how the evidence supported Dr. Hall and Dr. Jasti's opinions, the ALJ also explained that Harvin demonstrated normal strength in all muscle groups, had an even and regular gait, and no joint effusions, clubbing, cyanosis, or edema. (ECF No. 10, PageID #: 1213). This is substantial evidence to support the ALJ's conclusion that Dr. Malkamaki's opinion was not supported by the record evidence.

Moreover, the ALJ pointed out one inconsistency directly within his discussion of Dr. Malkamaki's opinion—the third reason the ALJ gave for giving the opinion less weight. The ALJ pointed out that Dr. Malkamaki opined that Harvin could only walk for five minutes despite that fact that Harvin herself stated she could walk a mile. Harvin correctly points out that the ALJ misstated Harvin's testimony. The ALJ stated that Harvin reported being able to walk an hour. However, the ALJ had given the correct report of one mile previously in his decision and, regardless, Harvin's testimony was inconsistent with Dr. Malkamaki's opinion. This was another "good reason" to assign the opinion less weight. Finally, the ALJ explained that Dr. Malkamaki merely cited Harvin's knee and back issues, without giving more explanation of how her knee

and back diagnoses supported his opinion. This was a "good reason" for the ALJ to rely on. The regulations specifically state that "the more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). The fact that Dr. Malkamaki failed to give a more detailed explanation of his check box opinion was a factor the ALJ could consider. Thus, the Court concludes that the ALJ did not err as the combination of the ALJ's reasons provided substantial evidence for his treatment of Dr. Malkamaki's opinion.

### c.    Dr. Munzar's Opinion

Harvin next argues that the ALJ violated the treating source rule by rejecting Dr. Munzar's opinion. Dr. Munzar completed a medical source statement which, in relevant part, stated the following. Harvin could frequently carry five pounds, walk one hour of a workday, and sit one hour of a workday. Harvin needed to elevate her legs to a forty-five-degree angle at will. She experienced pain that would interfere with her concentration and would need unscheduled breaks throughout the day. The ALJ gave this opinion little weight, explaining:

> While the records support some level of physical limitation, the level indicated by Dr. Munzar on the pre-printed check-list form are not supported by the objective medical and treatment records (C11F; C15F; C16F; C17F; C21F; C22F; C24F; C25F; C26F; C27F; C28F). Additionally, I note that Dr. Munzar is an internal medicine specialist and though he indicates the claimant has high levels of physical functional limitations on the form, he does not offer specific explanation or support from the treatment records beyond stating "arthritis of the spine" to support the level of limitations indicated. Further, to the extent the opinions considered the claimant's symptoms and decreased range of motion after her left lower extremity injury from January 2020, there is no evidence that the severe impairment from the fracture will last 12 months or longer from the date of injury

(ECF No. 10, PageID #: 1214).

Harvin first asserts that the ALJ erred in his evaluation of Dr. Munzar's opinion because he failed to identify Dr. Munzar as a treating physician. The Commissioner responds that although the ALJ did not identify Dr. Munzar as a treating physician, he nonetheless gave good reasons for assigning his opinion less than controlling weight—meeting the goal of the treating source rule. The Court agrees. The ALJ directly attacked Dr. Munzar's opinion and, as discussed below, gave good reasons for assigning the opinion less weight. Thus, failing to identify Dr. Munzar as a treating physician was harmless error at most. *See Richards v. Comm'r of Soc. Sec.*, No. 1:13 CV 1652, 2014 WL 4421571, at *9 (N.D. Ohio Sept. 8, 2014) ("An ALJ may accomplish the goals of this procedural requirement by indirectly attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record." (citations omitted)).

Harvin then asserts that the ALJ erred by assigning Dr. Munzar's opinion little weight. She argues that the ALJ "generically" states that the opinion is not supported by objective evidence while failing to reference evidence consistent with the opinion—a different doctor's finding osteoarthritis of the knees and Dr. Malkamaki's opinion. First, the Court concludes that, as explained above, the ALJ relied on findings of normal strength, no joint effusions, and an even and regular gait to support his RFC—findings inconsistent with limiting Harvin to standing only one hour in a day. The ALJ also noted that the record contained few complaints, if any, of issues with walking, sitting, or standing. Thus, there was ample support for the ALJ's conclusion that the record did not support and was inconsistent with Dr. Munzar's opinion.

Second, the Court notes that the ALJ did acknowledge evidence of severe arthritis of the knees in his opinion.  (ECF No. 10, PageID #: 1209). The ALJ simply relied on other evidence in making his finding. Similarly, the ALJ explained why he did not accept Dr. Malkamaki's

opinion. Thus, this is not a situation in which the ALJ failed to consider evidence that supported Harvin's claim for disability. The ALJ weighed all the evidence and appropriately concluded that it did not support a finding of disability. Nonetheless, throughout her brief, Harvin argues that the ALJ "cherry-picked" the evidence, "selectively parsing [the] record . . . to avoid analyzing the relevant evidence." (ECF No. 13 at 20). However, "[t]he problem with a cherry-picking argument is that it runs both ways. [Claimant] argues the ALJ only focused on the positives, whereas [her] brief emphasizes the negatives. Crediting [Claimant's] argument here would require the Court to re-weigh evidence — which it cannot do." *Colvin v. Comm'r of Soc. Sec.*, No. 5:18 CV 1249, 2019 WL 3741020, at *14 (N.D. Ohio May 8, 2019). Instead, to be successful, a claimant must show that the ALJ's decision is not supported by substantial evidence. "[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is not sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion." *Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010). The Court determines that despite the evidence Harvin showcases (evidence of osteoarthritis and Dr. Malkamaki's opinion), the ALJ's decision is supported by substantial evidence. Specifically, the ALJ relied on normal findings of strength, conservative treatment, and multiple state agency opinions. Thus, the Court concludes the ALJ did not err in assigning Dr. Munzar's opinion little weight.

### d.    Counselor Kanareff's Opinion

Harvin next asserts that the ALJ violated the treating source rule in evaluating the opinion of her treating counselor, Ms. Kanareff. Ms. Kanareff filled out a check-box opinion that indicated that Harvin had mild to moderate limitations in the areas relevant to understanding,

remembering, or applying information. She also opined that Harvin had limitations ranging from moderate to marked in the areas related to interacting with others, adapting or managing oneself, and concentrating, persisting, or maintaining pace. The ALJ considered this opinion and explained that he gave little weight to parts of the opinion and accepted others.

> I have given little weight to several of Ms. Kanareff's opinions because they are not supported by the overall evidence of record concerning the claimant's mental functioning. These include Ms. Kanareff's opinion that the claimant was markedly impaired in terms of her ability to understand and respond to social cues; and in terms of her ability to respond to criticism; and in terms of her ability to interact with others without argument; and her ability to work closely with others; and her ability to respond to demands (C12F). Besides not being supported by the evidence referenced above concerning the claimant's mental functioning, the aforementioned opinions of Ms. Kanareff are also at odds with the opinions of Ms. Schwartzman and Mr. Finnerty. As between these sources, I have given more weight to Ms. Schwartzman's and Mr. Finnerty's opinions. This is because these sources are considered experts in Social Security disability programs, and because there is no evidence that Ms. Kanareff possesses such programmatic knowledge. Indeed, under Social Security disability law, Ms. Kanareff is not considered an acceptable medical source. I have also given more weight to the opinions of the reviewing State agency psychologists because their opinions are supported by the evidence, including the evidence these sources referenced in their respective reports, and the additional evidence I have referenced in this decision regarding the claimant's mental functioning for the relevant period (C2A:8, 10; C4A:9, 12).

(ECF No. 10, PageID #: 1215).

Harvin argues that the ALJ erred by "cherry-picking" Ms. Kanareff's opinion—crediting only the parts of the opinion that indicated Harvin had mild limitations and rejecting portions that indicated Harvin had marked limitations. (ECF No. 13 at 19). However, the Court notes that Harvin failed to provide any support for the contention that the ALJ was required to accept either all or none of Ms. Kanareff's opinions. This argument is, therefore, waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (citations omitted)). Moreover, as will be discussed below, the ALJ supported his treatment of Ms. Kanareff's opinion with substantial evidence.

Harvin next asserts the ALJ failed to identify why the overall evidence was insufficient to support marked limitations. Harvin also points to evidence that she suggests supports Ms. Kanareff's findings. Although the ALJ did not explain what evidence was inconsistent with Ms. Kanareff's opinion within his discussion of her opinion, the ALJ did list evidence earlier in his opinion. The ALJ explained that Harvin's treatment was conservative and Harvin reported improvement in her symptoms with medication compliance. (ECF No. 10, PageID #: 1212). Within his discussion of the medical evidence, the ALJ also noted that Harvin presented as polite and friendly, appeared well-groomed, was cooperative, and was able to understand and respond to questions with "adequately developed responses." (ECF No. 10, PageID #: 1209–11). The ALJ also stated that Harvin showed no signs of being distracted upon examination, appeared to be functioning within the average range of intelligence, repeated four digits forwards and three digits backwards, and made good eye contact. (ECF No. 10, PageID #: 1211). Thus, the ALJ did cite evidence inconsistent with Ms. Kanareff's opinion and merely chose not to repeat it within this discussion. There is no requirement that he do so. *See Hanft v. Colvin*, No. 1:15-CV-200, 2015 WL 5896058, at *10 (N.D. Ohio Oct. 8, 2015). The Court also notes that the ALJ specifically stated that the opinion was inconsistent with the state agency opinions as well. Thus, the ALJ's conclusion that Ms. Kanareff's opinion was not supported by the overall evidence is supported by substantial evidence. As discussed above, the fact that Harvin can point to evidence that supports her decision is not sufficient for remand. *See Greene v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack

27

of substantial evidence by pointing to evidence of record that supports her position."). Accordingly, the Court concludes that the ALJ did not violate the treating source rule.

### 3.        The RFC is Supported by Substantial Evidence

Harvin's final argument is that the RFC is not supported by substantial evidence. Harvin asserts that the ALJ failed to incorporate limitations from the state agency physicians to whom he gave "great weight." Specifically, Harvin suggests that the ALJ should have included a limitation suggested by state agency reviewers Judith Schwartzman, Psy.D. and Todd Finnerty, Psy.D, requiring "flexibility in work schedule, taking breaks, and pacing" when Harvin's symptoms increase. Harvin states that this limitation was necessary because the medical expert at the hearing testified that Harvin's symptoms would increase with less frequent treatment. Harvin was currently attending therapy once a week. According to Harvin, her symptoms were bound to increase as full-time work would prohibit her ability to receive treatment. Not only does this argument assume that Harvin cannot receive treatment outside of work hours, but also the ALJ explained why he did not adopt the limitation. The ALJ reasoned that the limitation was "somewhat vague and did not provide vocationally specific language as to how often her symptoms might increase, or what level of symptoms increase would lead to the need for such provisions." (ECF No. 10, PageID #: 1215–16). This was a sufficient reason to omit the limitation despite giving the opinion great weight. *See Chiccola v. Comm'r of Soc. Sec.*, No. 1:18 CV 2940, 2020 WL 1031488, at *8 (N.D. Ohio Mar. 3, 2020) (concluding it was appropriate for the ALJ to assign state agency opinions great weight but omit limitations that "were too vague to translate into work-related restrictions").

Harvin's remaining arguments simply repeat her challenges to the ALJ's treatment of Ms. Kanareff's, Dr. Malkamki's, and Dr. Munzar's opinions. For the same reasons already discussed,

the Court concludes that the ALJ's assignments of weight were supported by substantial evidence. Moreover, the RFC is supported by multiple state agency opinions. *See Henderson v. Berryhill*, No. 1:18-CV-0189, 2018 WL 7681357, at *11 (N.D. Ohio Dec. 21, 2018) ("State Agency consultative opinions may constitute substantial evidence supporting an ALJ's decision."), *report and recommendation adopted*, No. 1:18CV189, 2019 WL 1010731 (N.D. Ohio Mar. 4, 2019). Accordingly, the Court concludes the RFC was supported by substantial evidence.

## VI.  Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision denying Harvin SSI and DIB.

IT IS SO ORDERED.

Dated: August 17, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE